UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for FIRST NATIONAL BANK OF NEVADA, SUCCESSOR-IN-INTEREST TO FIRST NATIONAL BANK OF ARIZONA,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>JASON HALPERN, SHAWN LAMPMAN, JOHN KNOTT, BRUCE K. ISAACSON, BRADLEY F. BURNS, LORI A. BURNS FAMILY TRUST u/a//d 4/15/1988, ORIGIN PROPERTIES, LLC, a Nevada limited liability company,<br><br>　　　　　　Defendants.<br><hr>LAKE ELSINORE 521 LLC, a Nevada limited liability company,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for FIRST NATIONAL BANK OF NEVADA, SUCCESSOR-IN-INTEREST TO FIRST NATIONAL BANK OF ARIZONA,<br><br>　　　　　　Defendant. | 2:08-CV-01571-PMP-GWF<br><br>Consolidated with:<br><br>Case No. 2:09-CV-02300-PMP-GWF<br><br><br>**FINDINGS OF FACT AND**<br>**CONCLUSIONS OF LAW** |

1    This is an action for a deficiency judgment following the foreclosure of
2 commercial real property securing a commercial loan. The parties are familiar with
3 the convoluted history of these consolidated cases, and in the Joint Pretrial Order
4 (Doc. # 175)  have stipulated to many of the underlying facts.
5    On January 5, 2009, Plaintiff, the Federal Deposit Insurance Corporation
6 ("FDIC") in its capacity as Receiver for First National Bank of Nevada, successor in
7 interest to First National Bank of Arizona (collectively "the Bank"), filed a
8 Supplemental Complaint (Doc. #29) against Defendants' alleging a single claim for
9 Deficiency Judgment in the sum of $9,136,858.41, plus interest and attorneys fees,
10 pursuant to NRS 40.455, and NRS 40.457.
11    The action was originally commenced February 14, 2008, by the filing of
12 the Bank's  complaint for breach of contract against Defendant Guarantors in
13 Nevada State District Court.  On June 30, 2008, First National Bank of Arizona
14 merged with First National Bank of Nevada, and First National Bank of Nevada
15 became the successor in interest on the claim.  On July 25, 2008, the Office of the
16 Comptroller of the Currency declared the Bank insolvent and appointed the FDIC its
17 Receiver.  On August 21, 2008, the FDIC was substituted as the real party in interest
18 and Plaintiff in this action.  On November 13, 2008, Plaintiff FDIC removed the
19 action from Nevada State Court, pursuant to 12 U.S.C. § 1819(b)(2)(B). This Court
20 has jurisdiction under 12 U.S.C. § 1821 and 28 U.S.C.  § 1331.  Based upon the
21 evidence adduced at the trial conducted October 16 - 18, 2012, and the facts
22 stipulated in the Joint Pretrial Order, the Court hereby enters the following Findings
23 of Fact and Conclusions of Law:
24    The task of the Court in determining whether a judgment creditor or
25 beneficiary under a deed of trust is entitled to recover a deficiency judgment is a
26 relatively straight forward one.

> "NRS 49.455 allows a judgment creditor to seek a deficiency judgment where the proceeds he received from the sale of the security do not equal the amount of his debtor's indebtedness. Judgment is limited, however, to the amount by which the debt exceeds the greater of the fair market value of the security on the date of the foreclosure sale or the amount bid at such sale by the creditor. NRS 40.459. Unruh v. Streight, 96 Nev. 684, 685, 615 P.2d 247, 248 (1980).

The Parties to this case dispute the fair market value of the subject Property on the date of the foreclosure sale, May 16, 2008. Plaintiffs and Defendants respectively retained two expert appraisers, Jason Lund and Andrew Minstein, who testified extensively at trial. Predictably, the appraisers assigned different fair market values to the subject Property as of May 16, 2008, and their differences were preordained by the fact that they employed distinct methods of calculating the fair market value. Plaintiffs' appraisal expert, Lund, insists that the appraised fair market value of the Property should be determined based upon its condition "as is" on the date of foreclosure. Defendants' expert, Minstein, opines that a "subdivision" method of appraisal should be employed to determine the fair market value of the Property "as if it were completed." Although the disparate appraisals of Lund and Minstein provide relevant retrospective opinion evidence as to the value of the subject Property two years earlier, the Court is not confined to considering only the opinions of the experts tendered by the Parties.

> "Fair market value is generally defined as the price which a purchaser, willing but not obliged to buy, would pay an owner willing but not obliged to sell, taking into consideration all of the uses to which the property is adapted and might in reason be applied." (Citation omitted) . . . "The district court could consider all relevant evidence in determining the value of the property." (Citations omitted) Id. at 686.

Here, evidence adduced at trial concerning the value of the subject Property

3

during the relevant period June 2005 through May 2008, provides the Court with a sound basis for determining the fair market value.

In 2005, when Defendants discussed with FDIC's predecessor-in-interest, First National Bank of Arizona, a possible loan for the acquisition of the subject Property, the Property was tentatively mapped for a subdivision. Before making the loan, the Bank hired an appraiser to independently determine the value of the property that would secure the loan. That appraisal concluded that the property, "as if" developed in its entirety as planned, was valued at $41,700.000.00 as of June 22, 2005.

In March 2006, Defendants negotiated the purchase of the subject Property for $20,490,000.00. On March 22, 2006, Defendant Lake Elsinore executed a Promissory Note in favor of First National Bank of Arizona in the principle amount of $18,400,000.00, and a Business Loan Agreement. The Note was secured by a deed of trust on the subject Property in favor of the Bank. Pursuant to the Note, Lake Elsinore agreed to pay the Bank the outstanding principle balance of the Note and accrued interest on the maturity date of March 21, 2007. Also on March 22, 2006, Guarantor Defendants Bradley Burns, Lori Burns, Jason Halpern, Bruce Isaacson, Bradley F. and Lori A. Burns Family Trust, Origin Properties, LLC, and KH Capital, LLC executed Commercial Guarantees by which each agreed to act at guarantors of Lake Elsinore's obligations under the Note and Business Loan Agreement. Over the next year, the Bank incrementally dispersed $17,728,429.17 of the principle amount of the loan to Lake Elsinore pursuant to the terms of the loan documents. On March 13, 2007, the Note's maturity date was extended by agreement of all parties to September 17, 2007.

Defendant Bradley Burns, the Guarantor Defendant chiefly responsible for overseeing the development of the subject Property, testified that when Defendants

4

acquired the Property in question it was subject to the Tentative Tract Map issued by the City of Lake Elsinore approving a subdivision which included among other things, streets and 521 residential lots.  The Tentative Tract Map also set forth 103 requirements which had to be met before the City of Lake Elsinore would issue a Final Tract Map and a certificate called a Community Facility District, or CFD.  The CFD was particularly important, according to Burns, because once issued by the City of Lake Elsinore, it assured the Defendant Developers and Guarantors that they would receive reimbursement from the City of Lake Elsinore of approximately $40,000 - $50,000 per lot upon completion.  Burns testified that from the time Defendants came into possession of the subject Property in March, 2006 through September 17, 2007, Defendants worked actively to satisfy the 103 conditions set forth in the Tentative Tract Map.  The uncontroverted testimony of Burns establishes that as of September 17, 2007, approximately six months of work remained to be completed to satisfy the conditions for the Final Tract Map and CFD from the City of Lake Elsinore.  Burns further testified that the Bank refused to release the remaining $671,000,000 of loan funds to Defendants necessary to enable Defendants to complete the remaining work necessary to satisfy the Tentative Tract Map requirements which would have led to the approval of the CFD valued at approximately $20,000,000 worth of reimbursements.

The trial record shows the Bank obtained two separate appraisals of the subject Property while Defendants were working to satisfy the requirements of the Tentative Tract Map.  Both appraisals were conducted by Daniel Huber, an appraiser with Commercial Asset Valuation in California.  The first appraisal prepared by Huber, dated September 26, 2007, provides an appraisal of the Property as of August 21, 2007,  consisting of three parts.  That appraisal assigned a fair market value of the subject Property "As Is" (assuming vacant land with a Tentative Tract Map for

521 residential lots) at $18,700,000.  Huber assigned an identical fair market value of $18,700,000 to the subject Property in a condition "As Is"/"As If Complete", assuming Final Tract Map approval for 521 lots, but no CFD approval.  Finally, Huber assigned an appraised value of $33,450,000 to the subject Property "As If Complete", assuming Final Tract Map and CFD approval for 521 lots/infrastructure.  Huber's appraisal as of August 21, 2007, therefore, shows a decreased appraised fair market value of the subject Property compared to that reflected in the appraised value of the Property "As If Complete" of $41,700,000 as of June 22, 2005.

        The Bank secured a second appraisal of the property by Daniel Huber as of April 17, 2008, approximately one month before the foreclosure sale on May 16, 2008.  William Asher, Real Estate Division Manager at the Bank explained that this appraisal was secured by the Bank to enable the Bank to assess the fair market value of the subject Property for purposes of the May 16, 2008 foreclosure sale.  Huber's second appraisal, reflected in his report of April 21, 2008, again contained fair market values of the subject Property based upon variable conditions.  First, Huber estimated an appraised value of $12,100,000 for the subject Property "As Is", assuming no Final Tract Map approval or CFD.  Second, assuming Final Tract Map approval, but no CFD, Huber estimated the value of the subject Property at $13,100,000.  Finally, Huber estimated an appraised value of the subject Property at $20,300,000, "As If Complete," assuming Final Tract Map and CFD approval.

        Notwithstanding the appraisal estimate of Plaintiffs' expert Jason Lund conducted two years later which estimated the "As Is" value of the Property at $8,400,000 on May 16, 2008, FDIC has stipulated that it will adhere to the "As Is" appraisal of $12,100,000 provided by the Huber appraisal conducted in April 2008.  The FDIC stipulation is consistent with the testimony of Robert Schwarzlose, Manager of the Receivership Division of FDIC, who testified that once a loan is

6

defaulted and a foreclosure sale occurs, it is not the policy of the FDIC to obtain subsequent appraisals of the Property which increase the amount of deficiency.

Confronted with the array of appraised fair market values provided by appraisers Daniel Huber, Jason Lund, and Andrew Minstein, the Court must decide which method of appraisal is appropriate, and thereafter which appraised value is supported by a preponderance of the evidence. In this regard, the Court is persuaded by the testimony of Andrew Minstein that the appraised value of the subject Property as of May 16, 2008 should be made "As If Complete" assuming Final Tract Map and CFD approval.

The Court's conclusion in this regard is consistent with the testimony of William Asher, Real Estate Manager at the Bank, who testified that all values assigned by Daniel Huber were considered by the Bank in making decisions regarding the loan extended to Defendants. This conclusion is also supported by the Nevada Supreme Court's Declaration in <u>Unruh</u> that fair market value is determined by "the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all the uses to which the property is adapted and might in reason be applied." Id. at 249. There is no evidence that the subject Property was adapted to any reasonable use other than as a subdivision as reflected in the Tentative Tract Map issued by the City of Lake Elsinore. This supports Andrew Minstein's utilization of a "subdivision development analysis" by which two years after the foreclosure sale, he arrived an "As If Complete" appraised value for the subject Property of $22,370,000. Whether the Court accepts the "As If Completed" appraised value assigned by Andrew Minstein, or the April 2008 "As If Complete" appraisal by Daniel Huber, the result in this case is the same. The Court concludes that the appraised value of $20,300.000 estimated by Daniel Huber as of April 17, 2008 is the most reasonable

appraised value of the subject Property supported by a preponderance of the evidence adduced in this case.  The Court therefore finds there is no deficiency and that judgment should be entered in favor of Defendants and against Plaintiff FDIC on its claim for deficiency judgement.

**IT IS SO ORDERED.**

Dated this 24th day of October, 2012.

_____
PHILIP M. PRO
United States District Judge